767 So.2d 88 (2000)
Steven A. HARTNETT and Pamela S. Hartnett
v.
LGD PROPERTIES, INC. Keith Casey and Pam Casey, et al.
Nos. 99-CA-2539, 99-CA-2540.
Court of Appeal of Louisiana, Fourth Circuit.
May 3, 2000.
Rehearing Denied August 15, 2000.
Writ Denied November 17, 2000.
*89 Richard A. Goins, Yvette LeBlanc Trahant, Goins Aaron, P.L.C., New Orleans, Louisiana, Counsel for Plaintiffs/Appellees.
John J. Messina, Kenner, Louisiana, and Edward J. McCloskey, Janice M. Kuo, McCloskey, Langenstein & Stoller, L.L.P., New Orleans, Louisiana, Counsel for Defendants/Appellants.
Court composed of Judge JOAN BERNARD ARMSTRONG, Judge STEVEN R. PLOTKIN, Judge CHARLES R. JONES.
PLOTKIN, Judge.
The primary issue in this appeal is the true ownership of stock in corporations formed in 1992 by defendants, Keith and Pam Casey, for the sole purpose of purchasing property previously owned by plaintiffs, Steven and Pamela Hartnett. The Hartnetts claim that the Caseys are simply nominee owners of the stock in the corporations, LGD Properties, Inc. and West, Inc., and that they, the Hartnetts, are the true owners. The Caseys allege that the stock and the corporations belong to them in truth and in fact.[1] The legal issues presented by this appeal do not effect any third parties. The trial court found that the Hartnetts were the true owners of the corporations. We affirm.

FACTS
At the commencement of the trial in this matter, the parties stipulated to the following facts[2]:
Prior to 1990, the Hartnetts owned, among others, the following pieces of immovable property: 1360-62 Camp Street; 1364-66 Camp Street; 1534-36 Camp Street; 1558 Camp Street; 1521-23 St. Andrew Street; 1428-30 Melpomene Street; and 4509-11 Annunciation Street. However, the Hartnetts began to experience financial difficulties in 1990. As a result of these financial difficulties, they were no longer able to pay off their debts as they came due.
The Caseys, who were good friends of the Hartnetts, created LGD Properties on January 27, 1992, and West, Inc. on October 27, 1992. LGD Properties executed a resolution through its secretary, Mrs. Casey, which gave Mr. Casey, president of LGD Properties, and/or Mrs. Casey, secretary of LGD Properties, full authority to transact completely the business of LGD Properties.
Thereafter, three acts of sale purporting to transfer property from the Hartnetts to LGD Properties were executed between January and November 1992. Acts of sale involving the specified properties were executed on the dates indicated: (1) 1364-66 *90 Camp StreetJanuary 16, 1992; (2) 1534-36 Camp Street; 1558 Camp Street, and 1519-23 St. Andrew StreetJuly 28, 1992; (3) and 1428-30 Melpomene StreetAugust 19, 1992.
Additionally, an act of sale purporting to transfer 4509-11 Annunciation Street to West was executed on November 12, 1992. After the sale of 4509-11 Annunciation Street to West, the property was supposed to be transferred to LGD Properties. However, said transfer was never accomplished.
Neither LGD Properties nor West had any assets at the time LGD Properties and/or West purchased any of the above-referenced properties. The Hartnetts paid any and all cash that was paid to the various banks at the time either LGD Properties or West purchased any of the above-referenced properties; such cash was part of a workout plan and was put toward the principal amount due on the mortgages.
By a sheriffs sale on May 19, 1994, LGD Properties purchased an empty lot located at 1360-63 Camp Street that the Hartnetts had previously owned. By an Act of Sale dated November 30, 1993, LGD Properties also purchased an empty lot located at 1124 Orange Street from a third party.
The Caseys are the listed shareholders of LGD Properties. The Caseys were also listed as the shareholders of West in the incorporation of West. However, on February 4, 1996, West was dissolved by Mrs. Casey as an incorporator of the company; no shares of stock were ever issued by West.
Mrs. Casey executed a letter dated August 20, 1995, addressed to the Caseys' son, Mike Casey. The stock certificates of LGD Properties issued to the Caseys have been signed in blank by Mr. Casey, acting as owner of his stock certificate and as president of LGD Properties on the certificate issued to Mrs. Casey.
The Hartnetts currently, and prior to April 1997, reside at 1558 Camp Street. On April 14, 1997, the Caseys took the following actions: (1) hand delivered an April 11, 1997, letter to all tenants residing at or utilizing the properties owned on paper by LGD Properties and West informing such tenants that all rental payments are to be sent to LGD Properties, as owner of said properties; (2) hand delivered a letter to the Hartnetts from their attorney, Ray W. Talley, demanding possession of 1558 Camp Street from the Hartnetts; and (3) closed out LGD Properties' Whitney National Bank checking account (Account No. XXX-XX-XXX-XXX), which had approximately $7,000 in it when such closure and withdrawal of funds occurred.
On April 16, 1997, the Caseys changed the lock on the entrance gate to 1558 Camp Street. On April 17, 1997, the Caseys took the following actions: (1) hand delivered a letter to all tenants residing at or utilizing the properties informing such tenants of the new alarm code which would be used in the future to gain access to the properties, and (2) had a Five-Day Notice to Vacate Premises located at 1558 Camp Street served on the Hartnetts. On April 18, 1997, the Caseys took the following actions: (1) hand delivered a letter to all tenants residing at or utilizing the properties informing such tenants that all locks on the premises would be changed by the Caseys, and (2) changed the alarm codes to all units located on the properties which had alarms installed in them.
On April 21, 1997, the Caseys changed all the locks located on the properties. On April 24, 1997, the Caseys ordered the water supplied to 1558 Camp Street to be turned off by the New Orleans Sewerage and Water Board. On April 25, 1997, the Caseys took the following actions: (1) locked the entrance gate to 1558 Camp Street open with a chain and lock; (2) disabled the automatic gate to the driveway at 1558 Camp Street in the open position; and (3) had the electricity to 1558 Camp Street turned off, leaving the Hartnetts without, not only electrical services, but also security system services. On *91 April 27, 1997, the Caseys took the following actions: (1) had the gas supplied to 1558 camp Street turned off, and (2) locked the second entrance gate to 1558 Camp Street shut via a new combination lock.
None of the parties incurred any personal liability concerning the debt of LGD Properties. After April 1997, LGD Properties paid approximately $1,997.40 in unpaid insurance premiums for some of the properties at issue in this case.

PROCEDURAL HISTORY
Following the events detailed above, the Caseys instituted eviction proceedings against the Hartnetts. On April 28, 1997, the Hartnetts responded by filing a possessory action seeking possession of the immovable property owned by LGD Property and West. Named as defendants were the Caseys, LGD Properties, and West. In their answer to the possessory action, the Caseys asserted a reconventional demand, seeking recovery of damages allegedly caused by the Hartnetts' mismanagement of the property. On April 13, 1998, the Hartnetts filed a second suit, a declaratory judgment action, seeking a declaration that they are the true owners of the stock in both LGD Properties and West, or, alternatively, the true owners of the immovable property. The cases were consolidated and tried before a jury.
Following the trial, the jury returned a verdict finding that the Hartnetts had physical, as well as legal, civil, possession of each of the disputed properties, and that the Hartnetts owned LGD Properties and West, as well as all of the disputed properties. The jury also awarded the Hartnetts $20,000 in damages. The trial judge entered judgment in accordance with the jury verdict. The Caseys appeal, specifying errors concerning all of the jury's findings in favor of the Hartnetts. The Caseys also assert that the jury improperly rejected their reconventional demand.

Ownership of the corporations
Although the parties raised, and the trial court decided, many complicated issues involving the possession and ownership of immovable property, our review of Louisiana law, in light of the facts of this case, convinces us that ownership of the corporations is the pivotal issue in this appeal.
The Caseys contest the jury's finding that the Hartnetts were and are the true owners of LGD Properties and West by pointing to the fact that all of the corporate records show that they were the only officers, directors, and shareholders of both corporations. Moreover, they point to the Hartnetts' admission that they do not appear as officer, directors, or shareholders on the corporate record of either corporation, nor do the corporate records indicate that the Hartnetts had any ownership interest in either corporation. Finally, the Caseys note the fact that the stock certificates were issued in their names, not the names of the Hartnetts

Applicable legal principles
However, Louisiana law contains no requirement that officers and directors of corporations be owners or shareholders in the corporation. See, James S. Holliday, Jr. and Rick J. Norman, Louisiana Corporations, vol. 1, §§ 7:13 and 7:95-7:99 (1998). Accordingly, the fact that the Caseys were the only officers and directors of the corporation has no impact on the ownership issue. Ownership in a corporation is vested solely in the shareholders. See, Church Point Wholesale Beverage Co., Inc. v. Voitier, 97-650 (La.App. 3 Cir. 1/14/98), 706 So.2d 1015, 1025. Thus, the issue to be decided is whether the Caseys or the Hartnetts were the true owners of the shares of stock in LGD Properties and West.
Under the provisions of the Uniform Stock Transfer Act, LSA-R.S. 12:601, the person in whose name a stock certificate stands is regarded as the legal owner of the stock. However, the Louisiana Supreme *92 Court has explained the purpose of that provision as follows:
The purpose of this statute, rather than to provide the requirements for a valid and irrevocable transfer of stock, is to provide protection for third persons who deal with the record owners of the stock and also to establish when one may be considered the record owner. Finn v. Ponsaa, 308 So.2d 352 (La.App. 4th Cir.1975), writs denied, 313 So.2d 238 (La.1975). In further support of this premise are a number of cases which hold that the Uniform Stock Transfer Act is not the exclusive means of transferring stock or evidencing ownership of it. Broussard v. Broussard, 340 So.2d 1309 (La.1976); Primeaux v. Libersat, 322 So.2d 147 (La.1975); Dardeau v. Fontenot, 326 So.2d 521 (La. App. 3rd Cir.1976); Smith v. Smith, 311 So.2d 514 (La.App. 3rd Cir.1974), writs denied, 313 So.2d 840 (La.1975); Richard v. Foods and Services, Inc., 162 So.2d 213 (La.App. 1st Cir.1964); Alley v. Miramon, 614 F.2d 1372 (5th Cir. 1980). Therefore, as has been previously held, although R.S. 12:601 may protect third persons dealing with the apparent owner of the stock, as between the parties compliance with R.S. 12:601 does not necessarily indicate a transfer of ownership. Rather, we must look to the intent of the parties. Alley v. Miramon, supra; Broussard, supra; and Primeaux v. Libersat, supra.
Succession of Dunham, 408 So.2d 888, 893 (La.1981). See also, Ackel v. Ackel, 595 So.2d 739, 742 (La.App. 5 Cir.1992).
Moreover, it is a longstanding principle of Louisiana law that a "stock certificate is merely evidence of corporate ownership." Ackel, 595 So.2d at 741. See also, Goltzman v. Goltzman, 372 So.2d 1262, 1265 (La.App. 3 Cir.1979). In Finn v. Ponsaa, 308 So.2d 352 (La.App. 4 Cir. 1975), this court explained as follows:
it is very plain that a certificate of stock is merely a paper evidence created for convenience, [sic] of the ownership of the share of stock; that it is not the thing which is in reality the subject of the ownership; that the thing which is in reality the subject of the ownership is the share of stock itself.
Id. at 354-55, quoting Succession of McGuire, 151 La. 514, 92 So. 40 (1922). See also, Chapman v. Hamer's Welding & Equipment Corp., 241 So.2d 289, 290-91 (La.App. 1 Cir.1970). Thus, actual corporate ownership "may be determined from all the facts and circumstances of the case." Ackel, 595 So.2d at 742.
Further, the Louisiana Supreme Court quoted the following general rule concerning stock ownership in Davidson v. American Paper Mfg. Co., 188 La. 69, 175 So. 753 (1937):
Presumption of Validity and Ownership. A certificate of stock is prima facie evidence both of the validity of the issue of the stock, and of the ownership of the shares represented thereby by the person designated in the certificate or the subsequent holder thereof under a proper endorsement and transfer. And of course, where a stock certificate is issued to and receipted for by a person, the presumption is, in the absence of any contrary showing, that he is the owner of the stock. But, except for purposes of an estoppel as against bona fide purchasers, such certificates are no more than prima facie evidence either of the validity of the issue, or of the stockholder's title.
Id. at 88, 175 So. at 759, quoting 14 C.J., § 709, p. 481. Thus, the presumption that the person to whom a stock certificate is issued is the owner arises only in cases where no contrary evidence exists. When contrary evidence exists, the fact that stock is issued to a particular party is considered only prima facie evidence of stock ownership.
Most of the cases cited above may be factually distinguished from the instant case because they involved questions of the validity of a transfer or donation of stock *93 from a record owner to some other party. The instant case does not involve the validity of a stock transfer. Nevertheless, the principles enunciated concerning the determination of the true ownership of corporate stock apply to this case, which does involve a contest between a record owner of stock and a third party claiming actual ownership. That fact is demonstrated by the cases discussed below, all of which involved facts somewhat similar to those presented by the instant case.
In Walker v. Supreme Industrial Life Insurance Co., 169 So.2d 245 (La.App. 4 Cir.1964), this court considered a claim by a plaintiff that he was the true owner of stock in the defendant corporation, and that the shares were placed in the name of the individual defendant "for convenience only." Id. at 246. The plaintiff claimed that a "mere nominee" retained the shares of the life insurance company for the benefit of the plaintiff "in order to comply with the legal requirements applicable to industrial life insurance companies." Id. at 247. After considering the facts and circumstances of the case, the court found in favor of the plaintiff. The court stated as follows:
Plaintiff's counsel, through the appropriate use of cross-examination and the marshalling [sic] of all documentary evidence at his disposal, revealed certain facts which proved with that certainty required by law that Walker was the actual owner of the stock.
Id. Thus, the court found, the plaintiff bore the burden of proving that the record owner "was his mere nominee." Id. at 248.
In the same year that it decided Walker, this court also decided Blum v. Latter, 163 So.2d 189 (La.App. 4 Cir.), writ refused, 246 La. 717, 167 So.2d 301 (1964), a case involving "simulated transfer" of stock to persons made for the "sole purpose of qualifying the holders thereof as officers and directors of the corporation." Id. at 193. The court found that the record owner "was never the real owner of the stock and it was in reality always the property of [the plaintiffs' decedent]." Thus, the plaintiffs were declared owners of the contested stock.
The predecessor court to this court also considered a similar issue to that presented by this case in State ex rel. Cabral v. Strudwick Funeral Home, 4 So.2d 760 (La.App.Orl.1941). In that case, the court issued a mandamus requiring the defendant corporation to transfer capital stock standing on the corporate books in the name of another back into the name of the plaintiff, "the true owner of the stock." The court found that the stock had been issued in the name of another "for convenience only." Id.
The final case demonstrating the applicability of the above principles to the instant case is the Louisiana Supreme Court's decision in Lockhart v. Dickey, 161 La. 282, 108 So. 483 (1926). In that case, the court found that the plaintiff was entitled to ownership of stock registered by her late husband in the name of the defendant. The court found that the husband's registration of the stock in the defendant's name was "a simulation pure and simple, done by the husband for the sole purpose of covering up the property and screening it from the knowledge and claims of his wife." Id. at 285, 108 So. at 484. In reaching that decision, the court expressly considered parol evidence. Id.
From the above cases, several principles for determining the true ownership of contested corporate stock emerge. In the absence of evidence to the contrary, proof of record ownership of stock raises a presumption that the person to whom the stock is issued is the true owner. However, when evidence to the contrary exists, the fact that stock is issued to a certain party provides only prima facie evidence of the true ownership of the stock. Thus, that evidence can be overcome by other evidence and testimony to the contrary. Moreover, the intent of the parties controls true ownership of stock in contests that do not involve third parties. Finally, *94 a court may consider all facts and circumstances of the case in reaching its decision concerning the true ownership of corporate stock. Thus, the determination of the true ownership of corporate stock is a factual question that may not be reversed by an appellate court in the absence of manifest error.

Application to facts of this case
As explained below, our review of the facts and circumstances of the instant case reveals no manifest error in the jury's finding that the Hartnetts are the true owners of the stock in LGD Properties and West, and therefore were the owners of the corporations themselves. We note at the beginning of this discussion that all the parties to this controversy admit that they believed that the property purchased by West had been transferred to LGD Properties prior to the time West was dissolved by Mrs. Casey on February 4, 1996. Thus, the owner of LGD Properties was considered by the parties as the owner of the property actually acquired by West. Because intent of the parties controls the ownership issue, we will consider only the evidence involving ownership of LGD Properties as dispositive of all ownership issues presented by this appeal.
As indicated in the discussion of the legal issues presented above, the fact that the stock certificates in LGD Properties were issued in the name of the Caseys is sufficient in itself to establish a prima facie case that the Caseys owned the corporate stock and were therefore the owners of the corporations. The burden therefore shifted to the Hartnetts to present evidence and testimony to overcome the Caseys' prima facie case of ownership.
The Hartnetts claim that LGD Properties was created solely for the purpose of protecting their real estate holdings from creditors. The uncontested record evidence in this case reveals that the Hartnetts provided all the monies advanced to their creditors in conjunction with the transfer of the properties from the Hartnetts to LGD Properties. They provided these cash assets, they stated, in order to reduce the amount of the mortgages they owed and thereby prevent a future financial crisis. The Caseys admit that they provided no cash to either LGD Properties or West.[3] Moreover, the Hartnetts testified that they managed the properties in exactly the same manner both before and after the transfer of the properties to the corporations, a fact that evidences their continued possession and ownership.
The Hartnetts also testified that all parties to the transactions knew that the corporations belonged to the Hartnetts, not the Caseys. They indicated that the parties intended for the record ownership of the corporations to be transferred to the names of the Hartnetts once their financial problems had been solved. This testimony was supported by a letter written by Mrs. Casey to her son, Mike Casey, the executor of the estates of both the Caseys, on August 20, 1995. That letter stated as follows:
In the event of our simultaneous deaths, you need to know the following regarding the relationship between Pam and Steve Hartnett, LGD Properties and us. Although LGD Properties are in your Dad's and my names, they do NOT belong to us. They belong solely to Pam and Steve Hartnett. We did this as an act of friendship to help them through some financial difficulties during a time when they could not show assets in their own names.
Your Dad engineered the purchase and financing of LGD Properties; however, we have not benefited from any income in the past, nor do we expect to in the future. All income and expenses are *95 handled in Pam's office (they use a signature stamp with my name on it).
You will need to get with Pam and Steve regarding the stock for LGD Properties. We have already signed them in blank and they will need to be dated using a date prior to our deaths. You will also need to call Linda Cox at Aucoin, Sanchez and Cox to work out the tax consequences, if any. This has been a corporate entity and should presumably pose no liabilities. If there are any, Pam and Steve will work it out with you, I am sure.
Thank you for handling this for us.
(Emphasis in original.) The letter was signed simply "Pam." The record evidence indicates that the letter was written in response to a request by Mr. Hartnett made just prior to the time that the Caseys were leaving for an extended motorcycle trip in Italy. Mrs. Hartnett was given an original copy of the above letter within a short time after it was written. Moreover, the uncontested record evidence reveals that the stock certificates were indeed signed in blank by Mr. Casey, for himself and for Mrs. Casey, as president of LGD Properties. This evidence, taken together, is sufficient to overcome the prima facie evidence that the Caseys' were the owners of LGD Properties.
Despite this evidence presented by the Hartnetts, the Caseys claim that the jury's factual finding that the Hartnetts are the true owners of LGD Properties is manifestly erroneous because it failed to properly credit three other pieces of evidence. First, the Caseys claim the jury improperly ignored a September 14, 1995, letter, also written by Mrs. Casey to her son, Mike. That letter, the Caseys assert, clearly revealed that the August 10 letter did not express the true intent of the parties regarding the ownership of LGD Properties. The September 14, 1995, letter stated, in pertinent part, as follows:
I am also enclosing a letter to you to the Hartnetts. As you know, they have been our best friends for some time. A couple of years ago they fell on hard times. Your Dad purchased some problem properties from them to keep them from going bankrupt, and worked a deal with the bank so that the properties should pay for themselves. However, since there isn't much equity in them and the real estate market isn't great, if anything happens to us, it would probably be just one more headache for you. Therefore, we though if we left these properties to them (they are already managing them) it would be good for them and no great loss to you and the kids. The enclosed letter might cut through the red tape and I gave them a copy.
The Caseys claim that the September 14 letter was sent to Mike at the same time as the August 20 letter, as a cover letter.
Second, the Caseys point to a September 16, 1992, letter written by Mrs. Hartnett to Linda Cox, who served as accountant for both the Hartnetts and the Caseys. That letter contained three similar paragraphs related to each of the transfers from the Hartnetts to LGD Properties. The first of those paragraphs stated as follows:
I have also attached a copy of the Sale With Assumption from Steve and me to LGD, Inc. for the property at 1428-30 Melpomene. LGD. Inc. would only pay $42,000 for the property, so Steve and I had to come up with $10,000 to make the deal. As you can see, this transaction occurred on August 19, 1992.
Similar statements were made concerning the transfer of the property at 1364 Camp Street, and the transfer of the properties at 1534 Camp Street, 1558 Camp Street, and 1521-23 Camp Street. The letter also contained the following paragraph:
There are approximately $65,000 worth of repairs that we have agreed to make to the above properties. LGD, Inc. would not purchase these properties unless these repairs were made.
*96 This letter, the Caseys claim, reveals that the Hartnetts were not the owners of LGD Properties because it indicates that LGD Properties made certain demands on the Hartnetts, and that under the Hartnetts' interpretation, they would be making those demands on themselves. Finally, the Caseys point to the fact that they retained control over the stock certificates even after they had been signed in blank as evidence that the Hartnetts were not the true owners of stock.
The Hartnetts offered explanations to explain each of these three facts relied upon by the Caseys to overcome their evidence. Concerning Mrs. Casey's September 14, 1995, letter, the Hartnetts claim that they never knew that the letter existed and question its authenticity. The Caseys did not prove that the letter was ever actually sent to Mike Casey, they say, implying that the letter might have been written after beginning of the troubles between the parties in an effort to support the Caseys' ownership claims. Moreover, we note that the September 14, 1995, letter is subject to multiple interpretations. The jury could have found that the letter was consistent with the statements in the August 10, 1995, concerning the Hartnett's true ownership of LGD Properties.
Concerning Mrs. Hartnetts' September 16, 1992, letter to Linda Cox, the Hartnetts claim that the letter was written on Mrs. Cox's requests in order to explain why the Hartnetts put money into a corporation that did not officially belong to them. Finally, concerning the fact that the Caseys retained custody and control of the stock certificates, even after they were signed in blank, the Hartnetts claim that the Caseys offered to keep the certificates in the safe in their home because the Hartnetts did not have a safe. The Hartnetts claim that they had a key to the house and could have retrieved the stock certificates at any time.
The jury heard all of the evidence presented by the Caseys, as well as the Hartnetts' explanations concerning that evidence. After considering all the facts and circumstances of the case, the jury returned a verdict in favor of the Hartnetts on every issue presented at the trial court. The parties presented diametrically opposed versions of the intent of the parties at the time of the formation of LGD Properties and the transfer of the immovable properties from the Hartnetts to LGD Properties. The jury made a clear credibility call, choosing to credit the testimony of the Hartnetts over that of the Caseys. Finding no manifest error in the jury's credibility decision, we affirm the finding that the Hartnetts were the true owners of both LGD Properties.

POSSESSORY ACTION
Although the determination of entitlement to possession of immovable property in cases where two parties claim possession ordinarily presents complicated legal and factual issues, our decision that the jury's finding that the Hartnetts were the owners of LGD Properties in truth and in fact was not manifestly erroneous greatly simplifies the determination of that issue in this case. The essence of the Caseys' assertion that they possessed the immovable property is grounded in their claim that they were the true owners of LGD Properties. Because they were the true owners of LGD Properties and because the Hartnetts knew that they owned the property, the Caseys claim that the Hartnetts were only precarious possessors of the property. La. C.C. art. 3437 defines "precarious possession" as "the exercise of possession over a thing with the permission of or on behalf of the owner or possessor." Under the circumstances of this case where the defendants' possessory claim is grounded in their ownership claim, our affirmation of the trial court's finding that the Hartnetts were the owners of LGD Properties renders the possessory issue moot.

Conclusion
Accordingly, we affirm the trial court judgment declaring the Hartnetts to be *97 the true owners of LGD Properties. Because the Hartnetts have been declared the true owners of LGD Properties, the Caseys' possessory claim to the immovable property owned by LGD Properties is moot. We pretermit any and all other issues raised by the parties.
AFFIRMED.
NOTES
[1] We note that, if the Hartnetts are correct, both parties intended to utilize legal procedures and the legal system to conceal true ownership of the properties.
[2] The trial judge read a list of these facts to the jury at the beginning of trial. Although we have elected to present these facts in narrative form, much of the parties' language has been retained.
[3] The cash payments made by the Hartnetts alone do not establish their ownership of the corporations; we are aware that debtors sometimes pay sums to others in order to extinguish a greater debt or liability. However, the jury heard this testimony as part of the evidence indicating the Hartnetts' ownership of the corporations at trial.